# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DAVID E. WOLFGRAM**
    **Plaintiff,**

**v.**                                                  **Case No. 12-C-632**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff David Wolfgram applied for social security disability benefits, alleging that he could no longer work due to ulcerative colitis and asthma. The Social Security Administration ("SSA") denied his application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. The Appeals Council then denied plaintiff's request for review, making the ALJ's ruling the final decision of the Commissioner of Social Security. See Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012). Plaintiff now seeks judicial review of the ALJ's decision.

## I. APPLICABLE LEGAL STANDARDS

Disability is determined under a sequential five-step test, pursuant to which the ALJ asks: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) whether the claimant possesses the residual functional capacity ("RFC") to perform his past relevant work; and (5) whether the claimant is capable of performing any other work in the national economy. See 20 C.F.R. § 404.1520; Weatherbee

v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled. A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).

On judicial review, the court will uphold the Commissioner's decision to deny a disability claim if the ALJ applied the correct legal standards and supported his decision with "substantial evidence." Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). Evidence is "substantial" if a reasonable person could accept it as sufficient to support the decision. Weatherbee, 649 F.3d at 568. The reviewing court may not re-weigh the evidence or substitute its judgment for that of the ALJ; if reasonable minds could differ over whether the claimant is disabled, the court must affirm the decision under review. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). In rendering his decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence, id., and the court in reviewing for fatal gaps or contradictions will give the opinion a commonsensical reading rather than nitpicking at it, Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010). In sum, the court will uphold a decision so long as the record reasonably supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008).

## II. FACTS AND BACKGROUND

### A.    Plaintiff's Application and Supporting Materials

On May 16, 2008, plaintiff applied for disability insurance benefits, alleging inability to work as of September 15, 2006 due to chronic asthma, ulcerative colitis, bleeding ulcers, and

2

migraine headaches.  Plaintiff was sixty-one years old at the time of his application.  (Tr. at 142, 174, 178.)

In a disability report, plaintiff indicated that his colitis required him to go to the bathroom "all the time," and his asthma caused shortness of breath.  (Tr. at 178.)  In a function report, he indicated that he performed some household chores such as washing windows, mowing grass, and gardening, but his wife and son helped.  (Tr. at 226.)  He stated that too much exertion caused breathing difficulty, and that he needed to stick close to a bathroom.  (Tr. at 229, 231-32.)  In a physical activities questionnaire, plaintiff indicated that due to his colitis he had bowel movements up to fifteen times per day with five seconds notice.  His asthma caused shortness of breath with even a little physical activity.  He listed daily activities of reading, watching TV, light house and yard work, washing the car, and taking short walks or bike rides. (Tr. at 236.)  He identified past employment as a mechanic from 1968 to 1993, a forklift driver from 1994 to 2005, and a floor scrubber in 2006.  (Tr. at 179, 186.)

## B.    Treatment Records

The SSA collected plaintiff's medical records, which documented his treatment for ulcerative colitis and asthma.  (Tr. at 291-407, 422-99, 500-1026.)  The records indicated that plaintiff had been treated for ulcerative colitis for more than twenty-five years, including regular colonoscopies and treatment with Remicade, an intravenous infusion designed to inhibit the inflammation that causes symptoms of the disease.[1]  (Tr. at 363-64.)  He also received medications, including prednisone, for chronic asthma.  (Tr. at 366-67.)

On September 15, 2006 (the alleged disability onset date), plaintiff went to the

_____

[1]See http://www.remicade.com/ulcerative-colitis/how-remicade-works.

3

emergency room complaining of weakness and black stools. Doctors admitted him to the hospital with a gastrointestinal bleed, which they cauterized. He was discharged home on September 18, 2006. (Tr. at 347-56.) Thereafter, he seemed to do well, with his condition largely controlled on Remicade. (Tr. at 302, 379.)

On January 29, 2008, plaintiff went to the emergency room with a complaint of melenic stools of several days' duration. Tests confirmed the presence of an ulcer but with no active bleeding so the doctors did not intervene surgically, and plaintiff was discharged home in stable condition. (Tr. at 291-300.) However, he returned to the hospital the following day with worsening symptoms, and a repeat upper endoscopy revealed a duodenal ulcer with bleeding, which was successfully cauterized. He was discharged home on February 4. (Tr. at 301-15.)

On June 23, 2008, plaintiff noted that his ulcerative colitis was largely quiescent on Remicade. (Tr. at 368-69.) On August 20, plaintiff commenced treatment with Dr. David Dozer, a gastroenterologist, noting that he had been on multiple therapies in the past, none of which seemed to work as well as Remicade. He noted that he had been doing quite well, down to three to four bowel movements per day. More recently, however, his frequency had increased to twelve to fifteen per day. (Tr. at 379.) Dr. Dozer noted that plaintiff's most recent colonoscopy showed that the disease was quiescent, but he continued to have frequent stools. Dr. Dozer suspected the stool volume was not related to active disease but rather possibly a "burnt out colon" or irritable bowel syndrome. (Tr. at 381.) Dr. Dozer increased plaintiff's Remicade dosage to see if this made any difference. (Tr. at 381.)

On August 22, 2008, plaintiff saw his pulmonologist, Dr. Jeffery Smale, complaining of fever, fatigue, and weight loss. Dr. Smale ordered a CT of the chest, which showed pneumonia, and arranged an infectious disease consult with Dr. Laura Radke. (Tr. at 387-88,

4

401.)  Plaintiff saw Dr. Radke on August 28, indicating that while the Remicade had provided significant relief until recently, his ulcerative colitis was now out of control.  He stated that he went to the bathroom every two hours around the clock, along with fever, fatigue, and achiness.  He reported some improvement on Levaquin for the pneumonia.  (Tr. at 321.)  Dr. Radke continued him on Levaquin and ordered tests.  (Tr. at 324.)

On October 30, 2008, plaintiff saw Sarah Locy, Dr. Dozer's physician's assistant ("PA"), for a pre-colonoscopy visit.  He complained of ten loose bowel movements daily but denied bleeding or abdominal pain.  (Tr. at 424.)  He again saw PA Locy on November 20, noting a flare-up of ulcerative colitis, with twelve to fifteen loose stools per day.  Dr. Dozer increased plaintiff's prednisone and scheduled a re-check in one week after plaintiff's next Remicade infusion.  (Tr. at 500.)

Plaintiff returned to Dr. Dozer on December 10, 2008, stating that his colitis was not improving despite the increase in his Remicade dose.  He indicated that he initially felt good on Remicade but lost this effect over the past two to three months and now had six to twelve loose, watery bowel movements per day.  (Tr. at 436.)  Concerned about possible infection, Dr. Dozer provided vancomycin, a type of antibiotic used to treat colitis.[2]  He also scheduled a colonoscopy; if the test revealed active disease, he would start alternative therapies such as 6-MP[3] or another biologic to achieve remission.  (Tr. at 437, 503.)  The December 18 colonoscopy showed active, chronic colitis, so 6-MP 50mg was added.  (Tr. at 505.)

---

[2]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604038.html.

[3]6-MP ("Mercaptopurine") is used to treat certain types of cancer, Crohn's disease, and ulcerative colitis (a condition in which sores develop in the intestines causing pain and diarrhea).  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682653.html.

5

Plaintiff returned to Dr. Dozer's office on January 6, 2009, complaining of soft, runny bowel movements ten to twelve times a day despite the 6-MP and Remicade. Dr. Dozer doubled the 6-MP dose to 100 mg and scheduled a follow-up in two weeks. (Tr. at 441, 517.) On January 19, plaintiff noted little improvement. Dr. Dozer shortened plaintiff's Remicade interval to six weeks and continued 6-MP. If plaintiff's condition did not improve over the next several months, Dr. Dozer would recommend seeing a surgeon for a proctocolectomy.[4] (Tr. at 445-47, 528.)

On February 11, 2009, plaintiff reported to Dr. Dozer that the 6-MP had helped his bowel symptoms. He complained of shortness of breath, which Dr. Dozer did not believe related to 6-MP. Dr. Dozer advised plaintiff to follow up with Dr. Griswold, his primary care physician. (Tr. at 533.)

On March 5, 2009, plaintiff saw Dr. Smale, complaining of cough, wheezing, fatigue, and increased shortness of breath for two weeks. (Tr. at 450.) Dr. Smale assessed acute bronchitis, providing an antibiotic. (Tr. at 454, 544.) Plaintiff returned on April 7, with an exacerbation of asthma/wheezing, and an x-ray showed some slight worsening of strandy infiltrate over the lingula. (Tr. at 549.) Dr. Eric Olafson diagnosed acute bronchitis and prescribed Avelox. (Tr. at 552.)

Plaintiff returned to Dr. Smale on June 1, 2009, noting that, overall, as long as he stayed on the prednisone, he seemed to be doing fairly well. (Tr. at 662.) Dr. Smale assessed chronic, severe, persistent asthma. During an August 19 follow-up with Dr. Smale, plaintiff reported doing very well from a breathing standpoint, and Dr. Smale reduced his prednisone

_____

[4]This is a surgery to remove all of the colon (part of the large intestine), rectum, and anus. http://www.nlm.nih.gov/medlineplus/ency/article/007381.htm.

dose.  (Tr. at 688.)

On November 9, 2009, plaintiff returned to Dr. Dozer for follow-up.  Dr. Dozer noted that since the increase in 6-MP plaintiff's symptoms had resolved; he denied abdominal cramps, rectal bleeding, and had only a very occasional loose stool.  (Tr. at 694-95.)  A December 18, colonoscopy showed colitis but no dysplasia.  (Tr. at 699.)  Dr. Smale renewed plaintiff's medications on December 21.  (Tr. at 704-05.)

In February 2010, plaintiff saw Dr. Griswold for a sinus infection, which was treated with antibiotics.  (Tr. at 715.)  He also continued on 6-MP.  (Tr. at 731.)  On April 26, 2010, he advised Dr. Smale that he was doing quite well with the prednisone tapered off.  (Tr. at 735.)

On April 28, 2010, plaintiff saw a physical therapist for a shoulder problem.  He stated that his shoulder started bothering him while he was trying to put a battery in his daughter's car. The note indicated: "He is retired, but enjoys working on cars and just doing handy work."  (Tr. at 738.)  He underwent physical therapy from April to June 2010, noting gradual improvement. (Tr. at 739-42; 748-49; 751-72; 757-58; 767-68; 777-80.)

On May 3, 2010, plaintiff returned to Dr. Dozer with "no issues at this time other than more frequent stools."  (Tr. at 744.)  He complained of fatigue, with soft bowel movements occurring at least five to six times per day.  He denied abdominal cramping or rectal bleeding. Dr. Dozer ordered various tests and recommended plaintiff try Imodium to see if this slowed his bowels down.  (Tr. at 745-46.)

On September 22, 2010, plaintiff returned to Dr. Smale, who assessed chronic lung disease, stable.  (Tr. at 852, 1019.)  He saw Dr. Dozer on November 8, 2010, doing quite well on Remicade and 6-MP, with four to five formed bowel movements per day without urgency, rectal bleeding, cramps, or other symptoms.  His only complaint was occasional stiffness and

7

swelling of some of his joints.  Dr. Dozer continued his treatment regimen.  (Tr. at 1022.)

## C.    Treating Source Reports

Plaintiff submitted reports from his treating gastroenterologist, Dr. Dozer.  In a November 25, 2008, RFC questionnaire, Dr. Dozer indicated that he had treated plaintiff since August 20, 2008 for ulcerative colitis.  He listed plaintiff's symptoms as chronic diarrhea, loss of appetite, malaise, and fatigue, with intermittent abdominal pain.  He indicated that plaintiff's impairments caused bowel movements twelve to fifteen times a day.  (Tr. at 210.)  The pain and other symptoms related to his condition would frequently interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. at 211.)  He stated that plaintiff could sit and stand/walk at least six hours in an eight hour day, and lift up to fifty pounds frequently.  (Tr. at 212-13.)  However, plaintiff needed a job that permitted ready access to a restroom and would need to take unscheduled restroom breaks once per hour of unknown duration with no advance notice.  (Tr. at 212.)

On May 17, 2010, Dr. Dozer completed an irritable bowel syndrome RFC questionnaire, indicating that he had treated plaintiff for ulcerative proctosigmoiditis and chronic colitis since August 20, 2008.  He noted symptoms of chronic diarrhea, loss of appetite, malaise, and fatigue, with a fair prognosis.  He further noted that plaintiff experienced intermittent abdominal pain and frequent diarrhea occurring five to six times per day.  (Tr. at 760.)  He indicated that plaintiff's symptoms would frequently be severe enough to interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. at 761.)  He estimated that plaintiff could walk ten blocks, and continuously sit or stand for one hour.  In an eight hour workday, he could sit and stand/walk at least six hours.  He required a job that allowed ready access to a restroom and would need to take unscheduled bathroom breaks once per hour of

8

unknown duration with no advance notice.  (Tr. at 762.)  Dr. Dozer imposed no lifting or postural limitations, finding that plaintiff could frequently lift fifty pounds.  (Tr. at 763.)[5]

## D.    State Agency Consultants

The SSA also arranged for plaintiff's case to be evaluated by two consultants.  On October 21, 2008, Dr. Mina Khorshidi completed a physical RFC assessment, finding plaintiff capable of light work with no further limitations.  (Tr. at 408-415.)  On April 13, 2009, Dr. Michael Baumblatt reviewed the record and affirmed Dr. Khorshidi's RFC.  (Tr. at 461.)

## E.    Administrative Proceedings

The SSA denied plaintiff's application initially (in reliance on Dr. Khorshidi's report) on October 17, 2008 (Tr. at 82, 84) and on reconsideration (in reliance on Dr. Baumblatt's opinion) on April 13, 2009 (Tr. at 83, 91).  Plaintiff requested a hearing before an ALJ (Tr. at 100-08) and on July 16, 2010, he appeared with counsel before ALJ Wayne Ritter  (Tr.  at 60, 110.)  The ALJ also summoned a vocational expert ("VE"), Beth Hoynik, to testify.  (Tr. at 109, 131.)

The ALJ asked plaintiff why, after a lengthy work history, he became disabled as of

---

[5]The record also contains a third report, dated July 20, 2011, after the ALJ's decision.  See Eads v. Sec'y of Dept. of Health and Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) ("The correctness of [an ALJ's] decision depends on the evidence that was before him.").  In that report, Dr. Dozer indicated that he had treated plaintiff for ulcerative colitis for three years.  He listed symptoms of chronic diarrhea and peripheral arthritis, with a good prognosis.  He indicated that plaintiff had occasional episodes of abdominal pain and bleeding, every one to two years.  (Tr. at 1002.)  He opined that plaintiff could sit continuously more than two hours, stand two hours at one time, and walk an unlimited number of blocks.  In an eight hour workday, he could sit at least six hours and stand/walk about four hours.  (Tr. at 1003.)  He needed a job that allowed ready access to a restroom and needed to take two to three unscheduled restroom breaks during a workday, of fifteen minutes duration, with ten minutes advanced notice.  He was unlimited in the ability to lift and engage in postural activities (e.g., twisting, stooping).  He would likely be off task due to symptom severity 5% of the day and was capable of moderate stress work.  His disease was currently in remission.  (Tr. at 1004.)  His impairment would produce good days and bad days, and about two absences per month.  (Tr. at 1005.)

9

September 15, 2006. (Tr. at 65.) Plaintiff explained that his employer terminated him at that time following the hospitalization for his ulcer surgery. (Tr. at 66.) He testified that after the termination he applied for a job but did not get it; he had not worked since then. (Tr. at 66-67.)

Plaintiff testified that his condition caused sudden, frequent bowel movements. The ALJ asked how long they lasted, and plaintiff responded: "Well, you, you sit there and I mean you sit there for five minutes and you get up. Two, three minutes later, you're right back in there. . . . They're quick and they're frequent." (Tr. at 70.) He confirmed that he was not constipated such that he had to be in the bathroom for a long time. (Tr. at 70.)

The ALJ asked how plaintiff was able to work for nearly thirty years with this condition, and plaintiff responded that when he was younger and stronger he was able to hide it, although he had plenty of accidents. (Tr. at 71.) He testified that he kept a log; sometimes it will be six times, other days more. (Tr. at 72.) He testified that his bowel was "just about shot," and the next step was to get a colostomy. (Tr. at 73.) He also indicated that he tired more easily than when he was younger and working, taking a two hour nap in the afternoon. (Tr. at 73-74.)

The VE identified plaintiff's past employment as a forklift driver and floor scrubber as medium work per the Dictionary of Occupational Titles ("DOT") but light work as plaintiff actually performed it.[6] (Tr. at 75-76.) The ALJ then asked a hypothetical question, assuming a person of plaintiffs age, education, and work experience, capable of light work with only moderate exposure to irritants such as fumes, odors, dust, and gases. The VE responded that such a person could perform plaintiff's past work as a forklift driver. (Tr. at 77.) The ALJ then added the requirement that the person:

_____

[6]Plaintiff's work as a mechanic occurred outside the applicable fifteen year period. (Tr. at 77.)

10

be allowed to have three unscheduled breaks per eight hour day.  Now I know they have certain scheduled breaks but, you know, this can fall within those but it may not.  So unscheduled breaks per eight hour day.  Would the forklift operator job still be available?

A	Duration?

Q	Five to ten minutes.

A	Five to ten minutes.  I'm thinking that would still be within the tolerable limits for most employers.

(Tr. at 78.)

The ALJ asked how many routine rest or break periods employers customarily allowed, and the VE responded that the standard is two fifteen minute breaks in an eight hour day with thirty minutes for a meal.  (Tr. at 79.)  The ALJ continued:

Q	If it would exceed these customary limits especially as to breaks, absences, and of course, I know what the answer is there, but on a regular basis, eliminate all the jobs you cited in work in a competitive workplace over and above what I've already asked you would be unscheduled?

A	Yes.

Q	If it were four, would that change it?

A	No, that wouldn't have any greater significant effect.

Q	Than three?

A	Than three, no.

Q	If one, when would it have more significant effect?

A	Okay.  If we're talking about breaks –

Q	Uh-huh.

A	– all right.  Probably somewhere between three and four is where we're looking.

Q	There's a maximum of, for unscheduled, short breaks –

11

A       Yes.

Q       – for bathroom breaks?  Okay.  Three to four.  Okay.

(Tr. at 79-80.)

## F.    ALJ's Decision

On September 2, 2010, the ALJ issued an unfavorable decision.  The ALJ determined that plaintiff had not worked since September 15, 2006, the alleged disability onset date, and that he suffered from the severe impairments of ulcerative colitis and asthma, neither of which qualified as disabling under the Listings.  (Tr. at 49.)  The ALJ then determined that plaintiff retained the RFC for light work, avoiding even moderate exposure to pulmonary irritants, which could accommodate three unscheduled breaks (five to ten minutes each) per eight hour workday.  (Tr. at 49-50.)

In making this determination, the ALJ considered plaintiff's statements regarding his alleged symptoms, finding that the record did not fully substantiate plaintiff's allegations.  The ALJ noted that plaintiff admitted in application documents that he performed a wide variety of household tasks, including maintaining personal hygiene, washing windows, mowing the lawn, gardening, reading the newspaper, and watching television; he also engaged in automobile maintenance as recently as April 2010.  Further, while plaintiff claimed that his colitis resulted in a minimum of twelve bathroom trips per day (every two hours around the clock), medical records suggested that this was the maximum – and only during periods of symptom exacerbation.  The records also indicated that plaintiff experienced significant relief from his prescription medication.  Finally, the ALJ noted that plaintiff worked for over two decades with the same medical problem and the same baseline number of daily bathroom breaks.  The ALJ found it noteworthy that plaintiff lost his job as a result of his absence due to surgery in

12

September 2006, not because of the number of bathroom breaks or asthma problems. While plaintiff credibly testified to being fatigued from his condition, he clearly was able to work with it, as he had the same condition for at least twenty-five years. (Tr. at 51.)

As for the medical opinion evidence, the ALJ found the reports of state agency consultants Drs. Khorshidi and Baumblatt, both of whom found plaintiff capable of light work, consistent with plaintiff's treatment history and level of daily activity and thus worthy of "significant weight." (Tr. at 51.) The ALJ found treating physician Dr. Dozer's opinion regarding plaintiff's exertional limitations generally consistent with the record and thus worthy of "reasonable weight," but he gave Dr. Dozer's requirement of hourly bathroom breaks "little weight" because this was twice the number plaintiff most consistently stated he needed when his symptoms were most severe (i.e., a break every two hours or twelve per day). (Tr. at 52.) In any event, the ALJ noted that his RFC afforded plaintiff nearly hourly breaks, in that the three unscheduled breaks he allowed supplemented the three traditional breaks normally given by employers in an eight hour workday. (Tr. at 52.)

Based on this RFC, the ALJ found that plaintiff could perform his past relevant work as a forklift operator. The ALJ noted that the DOT described this job as medium work, but plaintiff described the work as light as he actually performed it. The ALJ relied on the VE's testimony that someone of plaintiff's characteristics could perform this job as actually performed. (Tr. at 52.) The ALJ thus found plaintiff not disabled and denied his application. (Tr. at 52-53.)

The Appeals Council denied review on May 25, 2012. (Tr. at 25.) This action followed.

## III.  DISCUSSION

In this court, plaintiff argues that the ALJ erred in (1) relying on his ability to work for many years with ulcerative colitis; (2) crediting the state agency physicians' opinions over those

13

of his treating doctors; and (3) determining RFC, particularly the length and frequency of required breaks to use the bathroom. I address each contention in turn.

## A.     Ability to Work with Ulcerative Colitis

Plaintiff first argues that the ALJ should not have placed so much weight on the fact that he worked for many years despite suffering from ulcerative colitis. It is the job of the ALJ, not the reviewing court, to weigh the evidence, draw appropriate inferences, and resolve conflicts. E.g., Thorps v. Astrue, 873 F. Supp. 2d 995, 1005 (N.D. Ill. 2012); see also Stevenson v. Chater, 105 F.3d 1151, 1155 (7th Cir. 1997) (stating that an ALJ is entitled to make reasonable inferences from the evidence of record). Mere disagreement with the manner in which the ALJ weighed the evidence is not a basis for remand. See, e.g., Young v. Barnhart, 362 F.3d 995,1001 (7th Cir. 2004); Flener ex rel. Flener v. Barnhart, 361 F.3d 442, 447 (7th Cir. 2004). Plaintiff thus faces an uphill battle with this argument.

Plaintiff contends that the ALJ primarily focused on the fact that he lost his job because he had to miss work following his September 2006 surgery, not because of the number of bathroom breaks he required or his breathing problems. Plaintiff argues that this was mere speculation by the ALJ, as the record contains no evidence that he was fired because of the ulcer surgery. The ALJ provided this as just one of the reasons for his decision; more importantly, the record contains substantial evidence – plaintiff's hearing testimony (Tr. at 66-67) – supporting this finding.

Plaintiff likewise challenges the ALJ's finding that he was able to work with his disease for at least twenty-five years. Plaintiff again argues that this amounts to impermissible speculation, but the record contains substantial evidence, including plaintiff's testimony (Tr. at 70-71), treatment notes (Tr. at 379), and wage information (Tr. at 150), supporting the ALJ's

14

conclusion. Plaintiff contends that the ALJ ignored his testimony that after two decades of fighting the ulcerative colitis, he no longer had the stamina to do so. The record shows that the ALJ addressed plaintiff's fatigue. During the hearing, the ALJ and plaintiff engaged in the following colloquy:

> Q      [H]ow is the frequency that much different now than it was when you were working?
>
> A      It's always been there. Like I said I'd be in the bathroom a lot.
>
> Q      It's always been pretty much the same as it is now. Even 10 years ago, you were dealing with the same problem.
>
> A      I was dealing with it and pretty much went with it and did the best I could. Now, I'm just, I get up in the morning and I'm kind of tired and you know, putts [sic] around the house a little bit and, you know, I got to get my hour and a half, two hour nap in the afternoon which, you know, years ago I never had to do that.
>
> Q      The fatigue is getting to you more then?
>
> A      Fatigue and just, you know, the always check your blood to make sure you're taking your iron.

(Tr. at 73-74.) In his decision, the ALJ found that plaintiff "credibly testified to being fatigued from his condition" (Tr. at 51) and accepted that his conditions caused "significant functional limitations" (Tr. at 51), yet reasonably concluded that plaintiff retained the ability to perform light work with extra breaks. Plaintiff cites no additional evidence supporting greater restrictions due to fatigue.

## B.      Consideration of the Medical Evidence

Plaintiff next contends that the ALJ erred in weighing the medical evidence. Under SSA regulations, the ALJ must consider all "medical opinions" in the record. 20 C.F.R. § 404.1527(c). A medical opinion is a statement from a physician, psychologist, or other acceptable medical source that reflects judgment about the nature and severity of the

15

claimant's impairment, including symptoms, diagnosis and prognosis, what the claimant can still do despite his impairments, and his physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

Medical opinions from a claimant's treating physician are entitled to "controlling weight" if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(c); SSR 96-2p. Given their prominence, the ALJ must provide "good reasons" for discounting the opinion of a treating source. Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply reject it, SSR 96-2p; rather, he must decide what weight the opinion does deserve, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. Scott, 647 F.3d at 740; see also 20 C.F.R. § 404.1527(c).

The opinions of state agency consultants must also be considered, as they are experts in the evaluation of the medical issues in disability claims. SSR 96-6p. However, such opinions do not, by themselves, constitute substantial evidence sufficient to justify the rejection of a treating physician's opinion. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

Plaintiff argues that the ALJ ignored the report of his treating physician, Dr. Dozer, while cherry-picking opinions of the state agency physicians that he found more agreeable. The ALJ adopted the opinions of Drs. Khorshidi and Baumblatt that plaintiff retained the ability to perform light work (stand/walk six out of eight hours, lift ten pounds frequently and twenty pounds occasionally), finding those reports consistent with plaintiff's treatment history and level of daily activity. (Tr. at 51.) Plaintiff cites no medical evidence suggesting greater exertional

16

limitations; indeed, Dr. Dozer opined that plaintiff could stand/walk six hours in an eight hour workday and frequently lift up to fifty pounds. (Tr. at 762-63.) Far from ignoring Dr. Dozer's report, the ALJ found Dr. Dozer's opinion regarding plaintiff's exertional limitations generally consistent with the record and worthy of reasonable weight. (Tr. at 52.) The only significant portion of Dr. Dozer's report the ALJ rejected was the requirement of hourly bathroom breaks. See SSR 96-2p (noting that a treating source report may contain several medical opinions, which the ALJ may have to evaluate separately). The ALJ noted that this was twice the number plaintiff said he required when his symptoms were most severe, i.e., a break every two hours. (Tr. at 52.) The ALJ further noted that bathroom usage of that frequency occurred only during periods of symptom exacerbation, and the medical records indicated that plaintiff experienced significant relief from Remicade and later 6-MP. (Tr. at 51.) The ALJ may reasonably discount a medical opinion that is inconsistent with the record, see 20 C.F.R. § 404.1527(c); Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004), including the claimant's own testimony about his limitations, see, e.g., Simila v. Astrue, 573 F.3d 503, 515 (7th Cir. 2009); Reed v. Astrue, No. 09-1395, 2011 WL 578740, at *8 (D. Kan. Feb. 09, 2011).

Plaintiff argues that the ALJ also failed to adequately address Dr. Smale's opinion that he suffered from chronic obstructive asthma. Dr. Smale made this diagnosis, but it does not appear that he ever offered an actual "medical opinion" regarding plaintiff's asthma and the limitations flowing therefrom. See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [a medical condition], of course, says nothing about the severity of the condition."). The ALJ accepted plaintiff's asthma as a severe impairment, which precluded exposure to pulmonary irritants (Tr. at 49), and plaintiff points to nothing in Dr. Smale's treatment notes – or anywhere else in the record – suggesting greater limitations due to this

17

impairment.[7]

Plaintiff concludes that the ALJ gave too much weight to the opinions of the state agency doctors and not enough weight to the opinions of the treating doctors. However, weighing conflicting evidence from medical experts is exactly what the ALJ is required to do, and the reviewing court may not re-weigh the evidence. Young, 362 F.3d at 1001. Plaintiff argues that the ALJ failed to consider the various factors in § 404.1527 in evaluating the opinions, but he fails to identify any specific omissions in the ALJ's analysis, see Clarett v. Roberts, 657 F.3d 664, 674 (7th Cir. 2011) (noting that undeveloped arguments are considered waived), or to explain how the omission of any particular factor from the analysis affected the outcome, see Keys, 347 F.3d at 994-95 (applying harmless error analysis to claim for disability benefits). He contends that the medical assessment the ALJ relied upon was a marked outlier in the record. As noted, however, plaintiff fails to point to any medical evidence suggesting greater exertional limitations. Plaintiff faults the ALJ for relying on his daily activities, but the ALJ did not err in including these activities as one factor in his decision. See, e.g., Schmidt v. Astrue, 496 F.3d

---

[7]Plaintiff contends that Drs. Dozer and Smale "separately concluded that Wolfgram suffered far greater work restrictions than those recognized by the ALJ." (Pl.'s Br. [R. 9] at 10.) However, he cites no portion of the record indicating that Dr. Smale imposed greater – or indeed, any – restrictions. In his reply brief, plaintiff argues that Dr. Smale's diagnosis of "chronic obstructive asthma" constituted an assessment of severity. (R. 16 at 2.) Again, however, plaintiff points to nothing in Dr. Smale's treatment notes suggesting greater limitations due to asthma than what the ALJ found. Instead, he states that, "at a minimum, Wolfgram's asthmatic condition could have a material impact on the ultimate disability decision, and thereby required greater consideration and assessment by the ALJ." (Id. at 3.) He fails to explain what that impact might be. Plaintiff notes that at one point Dr. Smale encouraged him to consider "pulmonary rehabilitation to improve his condition." (Tr. at 367.) He also points to a disability report in which he claimed "shortness of breath." (Tr. at 178.) Neither suggest greater limitations. Therefore, any error in failing to address Dr. Smale's diagnosis was harmless. See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (noting that the harmless error doctrine applies to review of an ALJ's decision).

18

833, 843-44 (7th Cir. 2007).

**C.    RFC/Number and Length of Bathroom Breaks**

Finally, plaintiff argues that the ALJ erred in determining his RFC, and specifically, the number and length of bathroom breaks he required.  RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.  SSR 96-8p.  RFC must be based on the entire record, including the medical evidence, reports of daily activities, and the claimant's testimony regarding his symptoms.  SSR 96-8p.  The RFC assessment must also include a narrative discussion describing how the evidence supports the conclusions, citing specific medical facts and non-medical evidence and explaining how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.  SSR 96-8p.  The ALJ is required in determining RFC to consider medical source opinions, and if the RFC assessment conflicts with an opinion from a medical source he must explain why the opinion was not adopted.  SSR 96-8p.  However, the ultimate determination of RFC is an issue for the Commissioner.  20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ failed to adequately explain how the medical evidence affected his analysis at step four.  To the contrary (and as plaintiff concedes), the ALJ discussed the medical evidence at some length (Tr. at 50), explaining that the treatment notes showed that plaintiff visited the bathroom six to twelve times per day (i.e., every other hour) during periods of symptom exacerbation, contrary to the suggestion that he needed hourly breaks.  (Tr. at 51, 436, 441.)  The ALJ further noted that plaintiff experienced significant relief with near total resolution of his symptoms after doctors added the medication 6-MP.  (Tr. at 50,

19

695.)[8]  In any event, the ALJ noted that his RFC provided for nearly hourly breaks, with three unscheduled breaks in addition to the three traditional breaks allowed by employers.  (Tr. at 52.)

Plaintiff notes that the ALJ referred only to "unscheduled" breaks, as opposed to "additional" breaks, in initially setting forth the RFC.  (Tr. at 49-50.)  However, the ALJ later clarified that the breaks "outlined in the residual functional capacity are additional to the 3 traditional breaks that the vocational expert testified are normally given by employers in an 8 hour day."  (Tr. at 52.)  Plaintiff argues that the ALJ did not make clear to the VE that the unscheduled breaks would be "additional."  However, review of the ALJ's colloquy with the VE confirms that the unscheduled breaks could be additional.  The ALJ asked the VE about a person who needed "three unscheduled breaks per eight hour day" to use the restroom, which could fall within regularly scheduled breaks "but . . . may not."  (Tr. at 78.)  The ALJ then confirmed that employers customarily allow two fifteen minutes breaks plus thirty minutes for a meal, and that three to four unscheduled, short breaks to use the bathroom would be permitted.  (Tr. at 79-80.)[9]

---

[8]In his reply brief, plaintiff argues that the record shows that his condition has gotten worse, causing him to go "to the bathroom all the time, very uncontrollable."  (R. 16, quoting Tr. at 178.)  However, in making this argument plaintiff cites not medical evidence but his own disability report.  As discussed, the ALJ considered plaintiff's claims in this regard, finding that "the medical record does not fully substantiate his allegations."  (Tr. at 51.)  The ALJ specifically noted that plaintiff's symptoms improved with medication (Tr. at 51), a conclusion fully supported by the medical record.

[9]Apparently conceding that the ALJ's RFC allowed six breaks per workday, in his reply brief plaintiff argues that even this may not be sufficient.  He points to his testimony that his attacks were quick and frequent, and could recur within minutes, and Dr. Dozer's opinion that he required ready access to a restroom.  The ALJ considered this evidence, finding plaintiff's claim that he needed hourly bathroom breaks inconsistent with the medical evidence.

20

Plaintiff argues that the ALJ erred in finding that the breaks would be just five to ten minutes long. However, plaintiff testified that his trips were "quick" – "you sit there for five minutes and you get up." (Tr. at 70.) Plaintiff confirmed that he did not have a problem with constipation. (Tr. at 70.) Plaintiff contends that the ALJ erred in imposing his own idea as to how long someone with diarrhea attacks should spend in the bathroom. The ALJ relied on plaintiff's testimony, not his own intuition; in any event, plaintiff points to no evidence suggesting longer duration.[10] Plaintiff argues that the amount of time he needs to spend in the bathroom is a medical determination outside the purview of an ALJ. As noted above, while the ALJ must consider the medical evidence, the ultimate conclusion as to RFC is an administrative determination reserved to the Commissioner. The ALJ explained, citing medical facts and non-medical evidence, why he set the number of breaks lower than Dr. Dozer.[11]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of January, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[10]In his May 17, 2010 report, Dr. Dozer declined to offer an opinion as to how long plaintiff would need to be in the bathroom. (Tr. at 762.)

[11]On page 9 of his main brief, plaintiff quotes the ALJ's use of the boilerplate credibility language criticized by the Seventh Circuit in Bjornson v. Astrue, 671 F.3d 640, 644-46 (7th Cir. 2012). (Tr. at 51.) However, plaintiff does not specifically challenge the ALJ's credibility determination. In any event, after employing this template, the ALJ went on to provide specific reasons for his determination. Therefore, the ALJ's use of the template does not require remand. See Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).